889 So.2d 1013 (2004)
Jose A. QUINTERO, Appellant,
v.
STATE of Florida, Appellee.
No. 1D03-3726.
District Court of Appeal of Florida, First District.
December 30, 2004.
Nancy A. Daniels, Public Defender, and Jamie Spivey, Assistant Public Defender, Tallahassee, for Appellant.
Charlie Crist, Attorney General, and Anne C. Conley, Assistant Attorney General, Tallahassee, for Appellee.
HAWKES, J.
In this child sexual abuse case, Appellant argues the trial court abused its discretion by permitting an expert to testify that child victims do not initially fully disclose in 67% to 70% of child sexual abuse cases. We affirm.
*1014 It is well settled that, in child sexual abuse cases, "an expert may properly aid a jury in assessing the veracity of a victim of child abuse ... by discussing various patterns of consistency in the stories of child sexual abuse victims and comparing those patterns in [the victim's] story." Tingle v. State, 536 So.2d 202, 205 (Fla.1988). That is precisely what happened here. Appellant's conviction is AFFIRMED.
DAVIS, J., concurs, BROWNING, J., dissents with Opinion.
BROWNING, J., dissents.
I must dissent, as I think the expert testimony  that a certain percentage of children in similar situations to the child victim (S.S.) here during their initial interviews totally deny any sexual abuse according to test data  invades the jury's province and impermissibly bolstered S.S.'s testimony. See Tingle v. State, 536 So.2d 202 (Fla.1988).
During the pre-trial proceedings S.S., a child under 12 years of age, made conflicting statements relating to Appellant's guilt (Appellant was charged with and convicted of a lewd and lascivious act on S.S. a child under 12 years of age.) S.S. first stated: to her teacher, that Appellant had done nothing to her and that her brother lied and made up the incident when he stated to the contrary; to Ms. Raines, of the Department of Children and Families, that Appellant had done nothing to her; and to the school nurse, that Appellant had done nothing to her. However, several days later S.S. recanted such statements and gave a written statement to the child protection team that, if believed, supports Appellant's conviction. All of such inconsistent statements were presented at trial, and precipitated the rebuttal testimony asserted by Appellant as grounds for reversal.
On rebuttal, the State, in an attempt to rehabilitate S.S.'s inconsistent testimony, called Ms. Ellis, a forensic interviewer with the child protection team, and qualified her as an expert on child sexual-abuse behavior. She testified that according to tests, a child victim will totally deny any sexual abuse in the initial interview 67 percent of the time according to one test, and 70 percent according to another. Appellant timely objected to such testimony as impermissibly bolstering S.S.'s testimony and as requiring a Frye[1] hearing. The trial court overruled both objections. Appellant asserts as error the impermissible bolstering argument but fails, for some unknown reason, to assert the Frye basis and thereby waives that substantial appellate argument.[2]

Analysis
In my judgment, contrary to the majority opinion, Ms. Ellis' testimony is inadmissible under Tingle. There the following rule was adopted:
without usurping their exclusive functions by generally testifying about a child's ability to separate truth from fantasy, by summarizing the medical evidence and expressing his opinion as to whether it was consistent with [the victim's] *1015 story that she was sexually abused, or perhaps by discussing various patterns of consistency in the stories of child sexual abuse victims and comparing those patterns with patterns in [the victim's] story.
536 So.2d at 205.
The majority applies this rule to affirm, stating that "an expert may properly aid a jury in assessing the veracity of a victim of child abuse ... by discussing various patterns of consistency in the stories of child sexual abuse victims and comparing those patterns in [the victim's] story." While this statement encompasses the rule, the rule is misapplied here. The expert, by alluding to such tests, actually quantified as a percentage when a child victim's testimony is truthful in court. In effect, the jury was advised that a child victim's testimony is truthful 67 or 70 percent of the time when preceded by an untruthful statement at the initial interview that sexual abuse did not occur.[3] Expert opinion quantifying credibility for a jury violates the Tingle principle and leaves open similar expert opinions in too many circumstances under the precedential impact of the majority opinion. The majority has failed to cite, and cannot cite, any authority for admitting testimony quantifying credibility as a percentage based on tests of child victims similarly situated. We should not start now.
I foresee the majority's rationale being applied to similar circumstances previously unrecognized, which by implication reveals its impermissibility here. It is clear that in many life experiences, such as accidents and criminal acts, expert analysis can be applied to quantify the reliability of involved witnesses as a percentage. This is evidence not generally known by juries, and under the majority rationale could be logically admitted as an aid to a jury. Yet such testimony has never been admitted. To do so will lead to the unseemly practice of juries reaching verdicts by applying percentages compiled by experts of how persons testify in similar situations to that of a testifying witness. I cannot believe that our system of jurisprudence has "drifted" to the point where percentage calculations based on the statements of persons in similar situations compiled by so-called experts are admissible to prove the credibility of a witness. In my judgment, Tingle is limited to patterns of behavior of child victims in similar situations other than testimonial credibility, as was permitted here.
For these reasons, I would reverse Appellant's conviction and judgment and remand for a new trial under a proper application of Tingle.
NOTES
[1] Frye v. United States, 293 F. 1013 (D.C.Cir.1923)
[2] In addition to the scientific viability of the tests, I cannot conceive of all of the material ramifications that might have been developed had a Frye test been conducted. For example: Did the child victims tested issue three denials as S.S. did before the final "truthful" statement was made? Were the number of child victims included in the tests sufficient to make the tests viable? How was the determination made as to which statements were true? Who made the determination of truthfulness? and, What were the qualifications of the person(s) who determined the statements' truthfulness? One could ask such questions of this type indefinitely, but due to the Frye hearing's omission were unasked.
[3] I must assume in future cases that a child who does not give conflicting testimony as S.S. would be subject to impeachment by a defendant on the basis that the child might be untruthful, as 70 percent of the time conflicting statements are given.